**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
TONI & GUY (USA) LIMITED,           :
           :
         Plaintiff,      :     03 CV 2420 (RMB)
           :
    -against-       :     <u>**DECISION AND ORDER**</u>
           :
NATURE'S THERAPY, INC.,        :
           :
           :
         Defendant.    :
---------------------------------------------------------------x

**I.    Introduction**

On or about March 18, 2004, Toni & Guy (USA) Limited ("Plaintiff") filed an amended complaint against Nature's Therapy, Inc. ("Defendant"), alleging trademark infringement in violation of 15 U.S.C. §§ 1114 and 1125(a), trademark dilution in violation of 15 U.S.C. §§ 1125(c) and New York General Business Law § 360-l, false advertising in violation of 15 U.S.C. § 1125(a), deceptive acts or practices and false advertising in violation of New York General Business Law §§ 349 and 350, and unfair competition and misappropriation under New York law.  (First Amended Complaint, dated November 17, 2003 ("Complaint"), ¶¶ 42-59.)

On or about October 3, 2005, Plaintiff moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on its federal trademark infringement claim, and its New York State law claims for unfair competition and trademark dilution.  (Motion for Partial Summary Judgment, dated October 3, 2005; Toni & Guy (USA) Limited's Memorandum in Support of its Motion for Partial Summary Judgment, dated October 3, 2005 ("Pl. Mem."), at 1; Tony & Guy (USA) Limited's

Statement of Material Facts as to which there is no Genuine Dispute, dated October 3, 2005 ("Pl. Stmt."); Declaration of Tamara Dickerson, dated September 30, 2005.)

On or about October 24, 2005, Defendant filed an opposition, and cross-moved for summary judgment "on all of Plaintiff's claims." (Notice of Motion, dated October 24, 2005; Defendant Nature's Therapy, Inc.'s (i) Opposition to Plaintiff's Motion for Partial Summary Judgment and (ii) Memorandum of Law in Support of Defendant's Cross-Motion, dated October 24, 2005 ("Def. Mem."), at 2; Defendant Nature's Therapy, Inc.'s Statement of Material Facts to which there is no Genuine Dispute, dated October 24, 2005 ("Def. Stmt."); Defendant Nature's Therapy, Inc.'s Response to Plaintiff's Statement of Material Facts as to which there is no Genuine Dispute Pursuant to Local Rule 56.1(b); Declaration of Rocky Pagliarulo, dated October 20, 2005; Affidavit of Rosemarie Donnelly, dated October 23, 2005.) On or about October 28, 2005, Defendants also moved to strike the Declaration of Tamara Dickerson. (Notice of Motion to Strike Declaration of Tamara Dickerson, dated October 28, 2005; Defendant's Memorandum of Law in Support of Motion to Strike Declaration of Tamara Dickerson, dated October 28, 2005 ("Def. Dickerson Mem.").)

On or about October 31, 2005, Plaintiff filed a response to Defendant's opposition and cross-motion for summary judgment. (Tony & Guy (USA) Limited's Reply in Support of its Motion for Partial Summary Judgment and in Opposition to Defendant's Cross-Motion for Summary Judgment, dated October 31, 2005 ("Pl. Reply"); Tony & Guy (USA) Limited's Rule 56.1(b) Statement of Disputed Facts, dated October 31, 2005.) As part of its response, Plaintiff moved to strike portions of the Declaration of Rocky Pagliarulo and Affidavit of Rosemarie Donnelly. (Pl. Reply at 8-10.) On or about

November 4, 2005, Plaintiff filed an opposition to Defendant's motion to strike the Declaration of Tamara Dickerson. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Strike Portions of the Declaration of Tamara Dickerson, dated November 4, 2005.)

On or about November 7, 2005, Defendant filed a reply in support of its cross-motion for summary judgment. (Reply Memorandum of Law in Support of Nature's Therapy's Cross-Motion for Summary Judgment, dated November 7, 2005 ("Def. Reply").)

By letter dated November 8, 2005, the parties jointly submitted product samples in connection with the pending motions for summary judgment. (Joint Stipulation of Products Submitted, dated November 8, 2005 (hereinafter "Exh. ___"):

1. EXHIBIT A – TIGI's Catwalk Root Boost
2. EXHIBIT B – TIGI's Bed Head Manipulator
3. EXHIBIT C – Nature's Therapy's Lift & Texture Root Boost
4. EXHIBIT D – Nature's Therapy's Extreme Molding Crème with plastic outer cover
5. EXHIBIT E – Nature's Therapy's Extreme Molding Crème with cardboard outer cover
6. EXHIBIT F – Nature's Therapy's Manipulator Styling Crème.)

The parties have advised the Court that they waive oral argument.

**For the reasons set forth below, Plaintiff's motion for partial summary judgment is denied, and Defendant's cross-motion for summary judgment is granted as to all federal claims.**

II. **Background**

Plaintiff is a hair care company that uses the trademarks "TIGI," "Bed Head," "Manipulator," "Catwalk," "Catwalk Root Boost," and "Root Boost" in connection with its Catwalk Root Boost "foam-to-lotion spray mousse" and Bed Head Manipulator

"texturizing pomade." (Pl. Stmt. ¶¶ 1, 4-5, 17-18.) Plaintiff's Catwalk and Bed Head product lines "receive substantial unsolicited media attention," and experienced considerable sales between 2001 and 2004. (Pl. Stmt. ¶¶ 21-23.) Plaintiff has also spent a substantial amount of money in advertising its Catwalk and Bed Head products. (Pl. Stmt. ¶¶ 19, 20.) Plaintiff seeks to sell its products "only through authorized distributors and only in professional salons" but some of its products nonetheless "are sold in Wal-Mart and other retail stores." (Pl. Stmt. ¶¶ 7-8.)

Plaintiff's Catwalk Root Boost mousse sells for approximately $12.00. (Def. Stmt. ¶ 30.) It is packaged in an 8 oz. metal canister with a white top and a translucent cap. (Exh. A.) The canister is bright blue and has the TIGI Catwalk logo prominently displayed in silver inside a large letter "C" on the front. (Exh. A.) Below the logo it says "Root Boost spray for texture & lift." (Exh. A.)

Plaintiff's Bedhead Manipulator sells for approximately $18.00. (Def. Stmt. ¶ 23.) It is packaged in a 2 oz. clear plastic jar with a metallic top. (Exh. B.) The jar appears to be a dark blue-green because of the color of the product inside. (Exh. B.) The Bedhead Manipulator mark appears prominently in black on the side of the jar. (Exh. B.)

In 2001, Defendant created a product called Professionäl Lift and Texture Root Boost, which was an attempt "to create a lower cost version" of Plaintiff's Catwalk Root Boost. (Def Stmt. ¶ 24.) Defendant's Lift & Texture Root Boost sells for approximately $3.99. (Def. Stmt. ¶ 29.) It is packaged in an 8 oz. white metal canister with a white top and translucent cap. (Exh. C.) The most prominent text on the canister is the large "Professionäl" house mark. (Exh. C.) Next to the house mark it says "Lift & Texture Root Boost." (Exh. C.) Below that it states "TIGI's Catwalk Root Boost is a Competing

Product."  (Exh. C; Def Stmt. ¶ 26.)  On the back of the canister, at the end of two columns of small-print text, there is a disclaimer which states: "Catwalk Root Boost is a registered trademark of TIGI, Inc.  Nature's Therapy is not affiliated, connected, or associated with TIGI, Inc.  This product does not originate from and has not been sponsored, endorsed, approved or licensed by TIGI, Inc."  (Exh. C; Def Stmt. ¶ 26.)

In 2002, Defendant created a product called Professionäl Extreme Molding Crème, which was an attempt "to create a lower cost and improved version" of Plaintiff's Bed Head Manipulator.  (Def Stmt. ¶ 15.)  Defendant's Professionäl Extreme Molding Crème sells for approximately $3.99.  (Def. Stmt. ¶ 22.)  It is sold in a 2 oz. translucent plastic jar with a translucent plastic lid.  (Exh. D-E.)  On the side of the jar, in black lettering, it says "Professionäl Extreme Molding Crème," with the "Professionäl" house mark appearing most prominently.  The jar is packaged inside a predominantly light-blue plastic box or cardboard sleeve.  (Exh. D-E.)  The most prominent text on the sleeve is the large "Professionäl" house mark.  (Exh. D-E.)  Next to the house mark it says "Extreme Molding Creme."  (Exh. D-E.)  Below that it states "TIGI's Bed Head Manipulator is a Competing Product."  (Exh. D-E; Def Stmt. ¶ 20.)  On the back of the sleeve, at the bottom of a column of text, there is a disclaimer which states: "TIGI and Bed Head are registered trademarks of TIGI, Inc.  Nature's Therapy is not affiliated, connected, or associated with TIGI, Inc.  This product does not originate from and has

not been sponsored, endorsed, approved or licensed by TIGI, Inc." (Exh. D-E; Def Stmt. ¶ 20.)[1]

## II.      Legal Standard

"Summary judgment is appropriate when, after reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 45 (2d. Cir. 2000) (citing Fed.R.Civ.P. 56(c)); see Playtex Prods., Inc. v. Georgia-Pacific Corp., 390 F.3d 158, 161-62 (2d Cir. 2004) ("To support a finding of [trademark] infringement, there must be a probability of confusion, not a mere possibility. This standard does not change on summary judgment. The fact that on summary judgment the evidence must be construed in a light favorable to the non-moving party does not modify the standard itself, which requires a showing of a probability, or likelihood, of confusion.") (internal citations and quotation marks omitted); Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 482 (2d Cir. 1996) ("[S]ummary judgment in a trademark action may be appropriate in certain circumstances, where the undisputed evidence would lead only to one conclusion as to whether confusion is likely.").

"When cross-motions for summary judgment are filed, the standard is the same as that for individual motions for summary judgment. The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in

---

[1]      Defendant has also marketed this product as Professionäl Manipulator Styling Crème. (Exh. F.) The packaging is the same, except that the words "Professionäl Manipulator Styling Crème" appear on the jar and on the cardboard sleeve, and the statement "TIGI's Bedhead Manipulator is a Competing Product" appears on the side of the jar as well as on the sleeve. (Exh. F.)

the light most favorable to the non-moving party." <u>Palmiotti v. Metro. Life Ins. Co.</u>, No. 04 Civ. 718, 2006 WL 779640, at *7 (S.D.N.Y. Mar. 27, 2006) (internal citations and quotation marks omitted)..

**III.  Analysis**

**A.  Motions to Strike Evidence**

"In deciding a motion for summary judgment, the Court may consider 'supporting and opposing affidavits . . . made on personal knowledge' that set forth evidence that would be admissible at trial." <u>Rus, Inc. v. Bay Indus., Inc.</u>, 322 F. Supp. 2d 302, 307 (S.D.N.Y. 2003 (quoting Fed. R. Civ. P. 56(e)). "To the extent that an affidavit or declaration contains material that does not comply with Rule 56(e), the Court may strike those portions, or may simply disregard them." <u>Rus, Inc.</u>, 322 F. Supp. 2d at 307. "Thus, rather than parsing each challenged declaration to determine which portions to strike, the Court will disregard any statements that do not comport with Rule 56(e)." <u>See</u> <u>id.</u>; <u>see also</u> <u>Jewell-Rung Agency, Inc. v. Haddad Org., Ltd.</u>, 814 F. Supp. 337, 339 (S.D.N.Y. 1993) ("Each party moves to strike portions of the other's affidavits for failure to satisfy the requirements of Fed. R. Civ. P. 56(e). . . . In considering Haddad's motion for summary judgment, the Court will disregard portions of the Jewell and McGinity Affidavits that constitute inadmissible hearsay, lack a basis in personal knowledge, or are argumentative or conclusory."). As reflected in the body of this Decision and Order, the Court has considered all of the parties' submissions to the extent that they comply with Rule 56(e).

**B.  Federal Trademark Infringement Claims**

Plaintiff argues, <u>inter alia</u>, that "Defendant's use of [Plaintiff's marks] is likely to confuse consumers as to the origin, sponsorship, or affiliation of Defendant's products." (Pl. Mem. at 8.) Defendant argues, <u>inter alia</u>, that "the average consumer is unlikely to be confused about the source of the product[s]." (Def. Mem. at 16.)

"To determine whether there is a likelihood of confusion, [the Court applies] the eight-factor <u>Polaroid</u> balancing test introduced by [Judge Henry J. Friendly of the Court of Appeals for the Second Circuit] in <u>Polaroid Corp. v. Polarad Elecs. Corp.</u>, 287 F. 2d 492 (2d Cir. 1961). . . . [This] analysis is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused. The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." <u>Star Indus., Inc. v. Bacardi & Co., Ltd.</u>, 412 F. 3d 373, 384 (2d Cir. 2005) (internal citations omitted). The Court "may grant summary judgment where it finds, as a matter of law, that there is no likelihood of confusion to the public." <u>Mastercard Int'l Inc. v. Nader 2000 Primary Comm., Inc.</u>, No. 00 Civ. 6068, 2004 WL 434404, at *2 (S.D.N.Y. Mar. 8, 2004)

### 1. Strength of the Trademark

Plaintiff argues that its marks are strong because they have "become enormously popular among consumers and [have] achieved widespread consumer recognition and developed corresponding goodwill throughout the United States." (Pl. Mem. at 10.)

Defendant argues that "Plaintiff has presented no competent evidence of the distinctiveness of its marks."  (Def. Mem. at 16.)

"The strength of a mark is determined by its tendency to uniquely identify the source of the product. . . . Determination of strength therefore begins with inquiry as to whether the mark has the inherent distinctiveness that would entitle it to protection in the absence of secondary meaning.  Marks are classified, in ascending order of strength, as (1) generic; (2) descriptive; (3) suggestive; [or] (4) arbitrary or fanciful."  <u>Star Indus.</u>, 412 F. 3d at 384-85 (internal citations and quotation marks omitted).  "Acquired distinctiveness, as opposed to inherent distinctiveness, refers to the recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods or services." <u>Playtex</u>, 390 F.3d at 163; <u>see also</u> <u>Empresa Cubana del Tabaco v. Culbro Corp.</u>, No. 97 Civ. 8399, 2004 WL 602295, at *41 (S.D.N.Y. March 26, 2004) ("The strength of a trademark encompasses both the mark's inherent distinctiveness, or its arbitrariness in relation to the product for which it is used, and its acquired distinctiveness, or the extent to which prominent use of the mark in commerce has resulted in a high degree of consumer recognition.") (citing <u>Virgin Enters. Ltd. v. Nawab</u>, 335 F.3d 141, 147 (2d Cir. 2003)) (internal quotation marks omitted).

Plaintiff's marks may be categorized as "relatively strong."  <u>See</u> <u>Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.</u>, 182 F.3d 133, 139 (2d Cir. 1999). That is, Plaintiff's "Bed Head," "Catwalk," "Root Boost" and "Manipulator" marks are suggestive because consumers would only associate the marks with hair care "through the use of imagination, thought or perception." <u>See</u> <u>Star Indus.</u>, 412 F. 3d at 385 ("Suggestive marks are those that are not directly descriptive, but do suggest a quality or qualities of

the product, through the use of imagination, thought and perception."); Playtex Prods.,
Inc. v. Georgia-Pacific, Inc., No. 02 Civ. 7848, 2003 WL 21939706, at *4 (S.D.N.Y.
Aug. 12, 2003) ("I conclude that WET ONES is a suggestive mark in that it does not
name the product in any way, but merely suggests the qualities of wipes.  While the
phrase WET ONES is logically related to the wipes it names, it conjures up any number
of other products and requires some thought to realize the nature of the product.").[2]

Plaintiff has also received some recognition in the industry for its Bed Head Manipulator
and Catwalk Root Boost products, as demonstrated by its sales and unsolicited media
attention.  (See Pl. Stmt. ¶¶ 19-23 ("In 2003, AC Nielsen Market Decisions named
TIGI's Bed Head Manipulator and Catwalk Root Boost as the top-selling hair styling aids
in their product categories.  Bed Head Manipulator won the Stylist Choice Award for
Best Specialty Styling Product in both 2004 and 2005, and it also won the Teen People
Trendspotter Beauty Award for Best Texturizer in 2004."); see also First Nat'l Bank of
Omaha, Inc. v. Mastercard Int'l, Inc., No. 03 Civ. 707, 02 Civ. 3691, 2004 WL 1575396,
at *8 (S.D.N.Y. July 15, 2004) ("Distinctiveness in the marketplace, or acquired
distinctiveness, gauges the degree of consumer recognition the mark has achieved among
members of the purchasing public as the designator of the plaintiff's services.").

## 2.  Similarity of the Marks

Plaintiff argues that because Defendant uses Plaintiff's marks on Defendant's own
products and packaging, "[t]here is more than similarity; there is identity."  (Pl. Mem. at

---

[2]     Plaintiff's marks are not generic because they do not simply consist "of words
identifying the relevant category of goods or services."  See Star Indus., 412 F. 3d at 385.
The marks are not descriptive because they do not consist only "of words identifying
qualities of the product."  See id.  And, they are not arbitrary or fanciful, because such
marks "are ones that do not communicate any information about the product either
directly or by suggestion."  See id.

11.)  At the same time, Plaintiff argues (unpersuasively) that Defendant's use does not

constitute comparative advertising, because "Defendant's statement on its own products

that TIGI's Root Boost mousse or Manipulator pomade 'is a competing product' does not

point to any measurable attributes of the parties' products," and that "[a] competitor's

right to engage in fair and legitimate comparative advertising does not extend to the use

of a competing brand name on its own packaging, let alone directly on its own product."

(Pl. Mem. at 5, 7; Pl. Reply at 3.)

Defendant argues that the parties' respective products "possess virtually no

similarities in appearance" and that "[i]n addition to the obvious dissimilarities in

appearance, [Defendant] also takes care to add an express disclaimer that the product is

not 'affiliated, connected, or associated'" with Plaintiff.  (Def. Mem. at 17.)  Defendant

also argues that "a competitor's truthful comparisons of its products to a competitor's are

not only permissible under the law but beneficial to consumers," and that "[t]here is no

requirement that the word 'compare' be used, as long as the mark is used to inform the

consumer of the nature of the product and its use is not deceptive."  (Def. Mem. at 8, 11.)

"Of salient importance among the Polaroid factors is the 'similarity of the marks'

test, which attempts to discern whether the similarity of the marks is likely to cause

confusion among potential customers.  To apply this factor, courts must analyze the

mark's overall impression on a consumer, considering the context in which the marks are

displayed and the totality of factors that could cause confusion among prospective

purchasers."  Malletier, 426 F.3d at 537 (internal citations and quotation marks omitted);

see also Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 47 (2d Cir. 2000) ("[I]n

determining whether two marks are confusingly similar, we must 'appraise the overall

impression created by . . . the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers.'") (quoting <u>Streetwise Maps Inc. v. Vandam, Inc.</u>, 159 F.3d 739, 744 (2d Cir. 1998)); <u>Lang v. Retirement Living Publ'g Co.</u>, 949 F.2d 576, 581 (2d Cir. 1991) ("In [determining whether marks are confusingly similar], a court should look at the general impression created by the marks, taking into account all factors that potential purchasers will likely perceive and remember.").[3]

The Court finds there is no "likelihood of confusion" in this case.[4] First, the comparative language that appears on Defendant's products (". . . is a competing product") does not in itself make the marks confusingly similar. <u>See</u> <u>Cumberland Packaging Corp. v. Monsanto Co.</u>, 32 F. Supp. 2d 561, 580-81 (E.D.N.Y. 1999) ("A truthful reference to the trademark of another is permissible as long as the reference does not cause confusion as to source. Not only is the fair use of another's mark permissible, it may well be beneficial, since consumers can compare at a glance two competing

_____

[3] "[T]he Lanham Act requires a court to analyze the similarity of the products in light of the way in which the marks are actually displayed in their purchasing context." <u>Malletier</u>, 426 F.3d at 538. "Whether simultaneous viewing by consumers is likely to result in confusion is not relevant when it is serial viewing that is at issue given the market context or the type of confusion claimed. In such a case, a district court must ask not whether differences are easily discernable on simultaneous viewing, but whether they are likely to be memorable enough to dispel confusion on serial viewing." <u>Id.</u> In this case, the Court has analyzed both serial and simultaneous viewing. (<u>See</u> Pl. Stmt. ¶¶ 7-8.)

[4] The parties' marks as they appear on the products are:
        Exh. A: TIGI Catwalk Root Boost;
        Exh. B: Bed Head Manipulator;
        Exh. C: Professionäl Lift & Texture Root Boost;
        Exh. D: Professionäl Extreme Molding Crème;
        Exh. E: Professionäl Extreme Molding Crème;
        Exh. F: Professionäl Manipulator Styling Crème.

products.  The Federal Trade Commission's policy encourages comparative advertising, and to make the comparison vivid the Commission encourages the naming of, or reference to competitors.") (internal quotation marks omitted).  "Comparative advertising is not only permissible, but encouraged.  Such advertisements serve the 'beneficial purpose of imparting factual information about the relative merits of competing products.'"  Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC, 221 F. Supp. 2d 410, 423 (S.D.N.Y. 2002) (quoting Deere & Co. v. MTD Prods., Inc., 41 F.3d 39, 44 (2d Cir. 1994)).  "It has repeatedly been held that one may copy the unpatented formula of another's product and may use that product's trademark in its advertising to identify the product it has copied. . . . The only limitations the Lanham Act imposes on these slogans are that the advertiser cannot make false claims about the similarity of the products involved, and that the advertiser cannot use another product's mark in a way that is likely to confuse consumers about the source of the advertiser's product."  Tommy Hilfiger, 221 F. Supp. 2d at 423 (internal citations omitted); see also Weight Watchers Int'l, Inc. v. Stouffer Corp., 744 F. Supp. 1259, 1269 (S.D.N.Y. 1990) ("The Lanham Act . . . does not prohibit all unauthorized use of a trademark.  Trademarks of a rival company can be used in competitive advertising, so long as the advertising does not contain misrepresentations or create a reasonable likelihood that purchasers will be confused as to the source, identity, or sponsorship of the advertiser's product.") (internal quotation marks omitted).

Second, "the overall impression created by . . . the context in which [the marks] are found and . . . the totality of factors" is not one that is likely to cause confusion.  See Nabisco, 220 F.3d at 47 (quoting Streetwise Maps, 159 F.3d at 744).[5]  Here, "the

---

[5]      Plaintiff's argument "that there is no comparative advertising here . . . splits hairs

trademarks themselves are not confusingly similar, given the context in which a purchaser sees them." See Streetwise Maps, 159 F.3d at 744. The overlap of the terms "Manipulator" and "Root Boost" makes the marks only "marginally similar." (See Exh. A-F); see also Nabisco, 220 F.3d at 46 ("DENTYNE ICE and ICE BREAKERS are at best marginally similar because of the common use of 'Ice.'). And, the overall impression of the marks is very different, taking into account the context in which they appear, including the color and style of the packaging, text, etc. (See Exh. A-F); Savin Corp. v. Savin Group., 391 F.3d 439, 458-59 (2d Cir. 2004) ("[T]he setting in which a designation is used affects its appearance and colors the impression conveyed by it. Indeed, the impression conveyed by the setting in which the mark is used is often of critical importance.") (internal citations and quotation marks omitted). Plaintiff's "Catwalk Root Boost" mark appears in stylized silver writing (all horizontal) on a bright blue canister, while Defendant's "Professionäl Lift & Texture Root Boost" mark appears in dark blue block lettering on a white canister, with some of the text running vertically. (See Exh. A, C); see also Le Book Publ'g, Inc. v. Black Book Photography, Inc., No. 04 Civ. 10270, 2005 WL 2000136, at *5 (S.D.N.Y. Aug. 16, 2005) ("[P]laintiff and defendants here have obviously dissimilar marks. Plaintiff's mark is a black square with white letters, with 'LE' horizontally resting on the bottom, and 'BOOK' turned 90

---

too finely." Diversified Mktg., Inc. v. Estee Lauder, Inc., 705 F. Supp. 128, 132 (S.D.N.Y. 1988). Defendant's use of the phrase ". . . is a competing product" allows consumers to "compare at a glance two competing products." Cumberland, 32 F. Supp. 2d at 580-81. And, the (comparative) advertisement in this case has the same effect as a "like/love" slogan (e.g., "If You Like Tommy Hilfiger Your Pet Will Love Timmy Holedigger" or "if you love Ray-Ban, you'll LOVE Rayex"), as employed in Tommy Hilfiger, 221 F. Supp. 2d at 423, and Bausch & Lomb, Inc. v. Nevitt Sales Corp., 810 F. Supp. 466, 477 (W.D.N.Y. 1993). See Tommy Hilfiger, 221 F. Supp. 2d at 423 ("[C]ourts have upheld so-called 'like/love' slogans such as the one at issue here.").

degrees, running along the right edge of the square. Defendants' mark has a graphic of a book at the top, and then the words: THE BLACK BOOK are placed underneath the graphic, with each word on a separate line.").  Similarly, Plaintiff's "Bed Head Manipulator" mark appears in stylized black lettering on a clear plastic jar with a silver metallic top, while Defendant's "Professionäl Extreme Molding Crème" (or "Professionäl Manipulator Styling Crème") mark appears most prominently in block lettering on a blue plastic or cardboard sleeve, with a translucent plastic jar packaged inside.  (See Exh. B, D-F); see also Star Indus., 412 F. 3d at 386 ("Bacardi's label displays the Bacardi 'O' design alone against a clear background, whereas Georgi's label displays the Star 'O' alongside a number of other elements and against a white background.  Furthermore, each label prominently displays the brand logo-the stylized 'Bacardi' logo and bat symbol on the Bacardi O label, and the stylized 'Georgi' logo on the Georgi O label.").  Defendant's prominent use of its "Professionäl" house mark also "significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products."  See Nabisco, 220 F.3d at 46-47 (collecting cases); see also Swatch Group (U.S.) Inc. v. Movado Corp., No. 01 Civ. 0286, 2003 WL 1872656, at *4 (S.D.N.Y. Apr. 10, 2003) ("The prominent use of the house marks HAMILTON and ESQ on the parties' watches and in all of their advertisements goes far to eliminate the possibility of confusion in this case.  This factor, if not dispositive, weighs most heavily in Movado's favor.").

### 3. Proximity of the Products and their Competitiveness with One Another

Plaintiff argues that "the parties sell the same goods," and although Plaintiff "seeks to sell its goods only through professional salons, [some of its products

nonetheless] are sold in Wal-Mart and other retail stores." (Pl. Reply at 7, Pl. Mem. at 11.) Defendant argues that "[w]hile the products compete in the sense that they are similar products, the potential consumers represent two different markets and therefore are not in 'competitive proximity.'" (Def. Mem. at 18; Def. Reply at 6.) Defendant also argues that Plaintiff "markets its products only to professional salons" and Defendant targets "discount retailers, drug store chains and grocery stores," and that "[g]iven the disparity of marketing channels and the price, these are two different submarkets of consumers." (Def. Mem. at 18.)

"The proximity inquiry asks to what extent the two products compete with each other. In assessing product proximity we look at the nature of the products themselves and the structure of the relevant market." Brennan's, Inc. v. Brennan's Rest., LLC, 360 F.3d 125, 134 (2d Cir. 2004) (internal citations and quotation marks omitted); see also Savin, 391 F.3d at 458-59 ("This factor focuses on whether the two products compete with each other. To the extent goods . . . serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion.") (internal citations and quotation marks omitted). "In assessing commercial proximity, courts should compare all relevant aspects of the products, including price, style, intended uses, target clientele, and channels of distribution." Prof'l Sound Servs., Inc. v. Guzzi, 349 F. Supp. 2d 722, 734 (S.D.N.Y. 2004).

Here, the parties' products "are in moderate competitive proximity with one another." See Star Indus., 412 F.3d at 386. But while the products are similar and are sometimes sold in the same stores (e.g., Walmart), there is also a significant price difference ($3.99 for Defendant's products, compared with $12 or $18 for Plaintiff's

products).  (See Def. Stmt. ¶¶ 22-23 ("[Defendant's] 'Extreme Molding Crème' product sells for approximately $3.99 retail.  [Plaintiff's] Bedhead Manipulator product, which is sold in salons, sells for approximately $18.00 retail."), 29-30 ("[Defendant's] Lift and Texture Root Boost product sells for approximately $3.99 retail.  [Plaintiff's] Catwalk Root Boost product, which is sold in salons, sells for approximately $12.00 retail.").) Further, the parties appear to target different customer bases.  (See Def. Stmt. ¶¶ 13-14 ("[Defendant] markets its products primarily through trade shows, which discount retailers attend."  Defendant does not utilize beauty salons to market and distribute its products.)); see also Estee Lauder, Inc. v. The Gap, Inc., 108 F.3d 1503, 1511 (2d Cir. 1997) ("[W]e see no support for a finding that an appreciable number of ordinarily prudent consumers would likely think that Lauder, whose product costs $32.50 for less than two ounces in an upscale store, is the source of products that at Old Navy cost a small fraction of that price for 10 or 20 times that quantity.").

### 4.  Evidence that the Senior User May Bridge the Gap

Plaintiff argues that "[t]here is no gap to be bridged" because "[t]he parties sell the exact same types of products."  (Pl. Mem. at 11.)  Defendant argues that "there is no evidence of Plaintiff 'bridging the gap' in the future" because Plaintiff "has no intention to develop a less expensive product or to sell its product to retail stores or change its product line."  (Def. Mem. at 19.)

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so."  Star Indus., 412 F.3d at 387.

"Plaintiff has presented no evidence that it is likely to bridge the gap," either by selling lower-priced products that would compete more directly with Defendant's products, or by marketing its products directly to retail stores, as opposed to salons.  See Tommy Hilfiger, 221 F. Supp. 2d at 419.

### 5.  Evidence of Actual Consumer Confusion

Plaintiff argues that "actual confusion need not be shown to prevail under the Lanham Act."  (Pl. Mem. at 12.)  Defendant argues correctly that Plaintiff "has presented no evidence of even a single instance of a consumer who has bought [Defendant's] product under the misimpression that the product was [Plaintiff's]."  (Def. Mem. at 19.)

"While evidence of actual confusion is not necessary to the plaintiff's claim, its lack may under some circumstances be used against the plaintiff."  Cadbury Beverages, 73 F.3d at 482 (internal quotation marks omitted); see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 875 (2d Cir. 1986) ("[T]he complete absence of actual confusion evidence after a significant period of competition may weigh in a defendant's favor."); Mastercard Int'l, 2004 WL 434404, at *3 ("Evidence of actual confusion . . . is perhaps the most significant when considering the overall likelihood of confusion by the public.  The best evidence of likelihood of confusion is the occurrence of actual confusion and mistakes.  While it is not essential for a finding of trademark infringement to demonstrate actual confusion, there can be no more positive proof of likelihood of confusion than evidence of actual confusion.") (internal quotations and quotation marks omitted); Windsor, Inc. v. Intravco Travel Centers, Inc., 799 F. Supp. 1513, 1524 (S.D.N.Y. 1992) ("Although no evidence of actual confusion is necessary to

prove a likelihood of confusion, the court may infer from the lack of such evidence that consumer confusion is unlikely to occur.").

Plaintiff has not offered evidence that a single consumer, retailer, wholesaler, or distributor has been confused over the parties' products, nor has Plaintiff offered a survey showing that confusion is likely.  See Arrow Fastener Co., Inc. v. Stanley Works, 59 F.3d 384, 397 (2d Cir. 1995) ("Arrow did not submit any survey evidence or testimony of customers – retail or wholesale – that tended to prove actual confusion.  We conclude that Arrow failed to show 'actual confusion affecting purchasers.'); Miriam-Webster, Inc. v. Random House, Inc., 35 F.3d 65, 72 (2d Cir. 1994) ("There was no testimony by any consumer, retail or wholesale, who intended to buy a Merriam-Webster dictionary but mistakenly bought a Random House dictionary because of confusion between the two products' trade dresses.  The lack of survey evidence counts against finding actual confusion.  We conclude that Merriam-Webster failed to show actual confusion affecting purchasers.") (internal citations omitted).

While not necessarily dispositive, the lack of evidence of actual consumer confusion (despite the fact that the parties have competed in the marketplace for several years), weighs in favor of Defendant.  See Plus Prods. v. Plus Disc. Foods, Inc., 722 F.2d 999, 1006 (2d Cir. 1983) ("Despite three years of concurrent use, the district court found there were no instances of actual consumer confusion. . . .  [N]o evidence of confusion for over a three-year period, during which substantial sales occurred, is a strong indicator that the likelihood of confusion is minimal."); M&G Elecs. Sales Corp. v. Sony Kabushiki Kaisha, 250 F. Supp. 2d 91, 104 (E.D.N.Y. 2003) ("A plaintiff need not show actual confusion.  However, the complete absence of actual confusion after a lengthy

period of time creates an inference that future consumers will not be confused.  Based on M&G's failure to present any consumer survey evidence or customer testimony, Judge Boyle correctly drew an adverse inference against M&G and found this factor favored Sony.") (internal citations omitted).

### 6.  Evidence that the Imitative Mark was Adopted in Bad Faith

Plaintiff argues that "Defendant's conduct is a textbook example of bad faith" because Defendant sought "to capitalize on the popularity and goodwill associated with [Plaintiff's marks]."  (Pl. Mem. at 12; Pl. Reply at 8)  Defendant argues that "[t]here simply is no evidence of bad faith," because "only when [a] copied product is combined with copied packaging is it proper to infer intent to create confusion."  (Def. Mem. at 19-20.)

"Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products."  Star Indus., 412 F.3d at 388.

There is no evidence of bad faith, i.e., no evidence that Defendant "sought to confuse consumers about the source of their product[s]."  See Cumberland, 140 F. Supp. 2d at 255 ("Even if defendant did copy certain elements of plaintiff's trade dress, which is not at all evident, copying per se does not prove bad faith in determining confusion. For copying to be evidence of confusion the defendant must have copied for the purpose of causing confusion.  Placement of the NutraSweet name in bold black capital letters and the unique NutraSweet logo just above the center of the box contradict allegations that the defendant sought to confuse consumers about the source of their product.  Plaintiff has not presented sufficient evidence to support a reasonable finding that the defendant

intended its design to confuse purchasers as to the source of the products.").  That

Defendant created its own version of Plaintiff's successful products does not in itself

indicate bad faith, and Plaintiff has not shown that Defendant exhibited "the intent to

deceive purchasers as to the source of the product."  See Streetwise Maps, 159 F.3d at

745 ("The intent to compete by imitating the successful features of another's product is

vastly different from the intent to deceive purchasers as to the source of the product.");

George Basch Co., Inc. v. Blue Coral, Inc., 968 F.2d 1532, 1541 (2d Cir. 1992) ("There is

an essential distinction between a deliberate attempt to deceive and a deliberate attempt

to compete.  Absent confusion, imitation of certain successful features in another's

product is not unlawful and to that extent a 'free ride' is permitted.") (internal quotation

marks omitted).

### 7.  Respective Quality of the Products

Plaintiff does not argue that Defendant's products are of inferior quality, but

argues rather that because it has no "control over the quality" of Defendant's goods,

"[Plaintiff's] reputation [is] placed at the mercy of [Defendant]."  (Pl. Mem. at 13; Pl.

Reply at 8 ("The issue is not limited to quality; it is the quality control to which

[Plaintiff] is entitled.") (emphasis in original).  Defendant argues that Plaintiff "presents

no evidence regarding the quality of [Defendant's] products," and that "[a]bsent a

demonstration that [Plaintiff's] reputation is somehow harmed by a lower quality product,

this factor favors [Defendant]."  (Def. Mem. at 21; Def. Reply at 7.)

"[T]he quality factor of Polaroid is primarily concerned with whether the senior

user's reputation could be jeopardized by virtue of the fact that the junior user's product

is of inferior quality."  Star Indus., 412 F.3d at 389.  Because neither party has presented

evidence regarding the (comparative) quality of Defendant's products, this factor does not weigh in either party's favor. See Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 219 (2d Cir. 2004) ("In the absence of undisputed evidence supporting the superiority of Patsy's Brand's product, this factor cannot be enlisted in the Plaintiff's favor on summary judgment.").

### 8. Sophistication of Consumers in the Relevant Market

Plaintiff argues that "no amount of 'sophistication' on the part of consumers would allow them to determine that the accused products are not associated, connected or affiliated" with Plaintiff. (Pl. Mem. at 14.) Defendant argues that "ordinary consumers are readily familiar with comparative [advertising] by discount manufacturers and are unlikely to be confused." (Def. Mem. at 21.)

"As the theory goes, the more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace." Savin, 391 F.3d at 461. An "analysis of consumer sophistication considers the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." Star Indus., 412 F.3d at 390.

While neither party has submitted evidence of the level of consumer sophistication, it would appear that purchasers "are likely to examine with care" the products they apply to their hair. See Juicy Couture, Inc. v. L'Oreal USA, Inc., No. 04 Civ. 7203, 2006 WL 1012939, at *29 (S.D.N.Y. April 19, 2006) ("[C]onsumers of cosmetics . . . are likely to examine with care the products they apply to their skin and lips. The sophistication of customers and the attention they are likely to pay to the

cosmetics they purchase make it less likely that those familiar with the Couture brand would think that Lancôme's Juicy Wear was the product of a co-branding relationship between Couture and Lancôme.").  Plaintiff's consumers are (likely) more sophisticated than the average consumer, because of the relatively high price of Plaintiff's products, and their availability principally through salons.  <u>See</u> <u>Brockmeyer v. Hearst Corp.</u>, 248 F. Supp. 2d 281, 299 (S.D.N.Y. 2003) ("The relatively high price of the plaintiff's magazine may mean that purchasers give more thought to purchasing that magazine, and therefore bring a higher level of sophistication to their purchase decision."); <u>Origins Natural Res., Inc. v. Kotler</u>, No. 01 Civ. 1881, 2001 WL 492429, at *1, 3 (S.D.N.Y. May 8, 2001) ("Origins is a successful purveyor of upscale cosmetics and skin care products sold under the trademark ORIGINS. . . . Simply put, the goods involved are upscale, expensive products that will likely be purchased by sophisticated consumers.")

### 9.  Balancing the <u>Polaroid</u> factors

"When balancing the factors, district courts generally should not treat any single factor as dispositive; nor should a court treat the inquiry as a mechanical process by which the party with the greatest number of factors wins.  Instead, the court 'should focus on the ultimate question of whether consumers are likely to be confused.'"  <u>Playtex</u>, 390 F.3d at 162.

Upon balancing all of the <u>Polaroid</u> factors, the Court concludes that there is no likelihood of confusion between Plaintiff's marks and Defendant's marks.  Among other things, the marks are not confusingly similar in appearance.  (<u>See</u> <u>supra</u> pp. 10-14 ("[T]he overall impression of the marks is very different, taking into account the context in which they appear, including the color and style of the packaging, text, etc. . . . Defendant's

prominent use of its 'Professionäl' house mark also significantly reduces, if not
altogether eliminates, the likelihood that consumers will be confused as to the source of
the parties' products.").)  Plaintiff has failed to present any evidence of actual consumer
confusion, despite the fact that the products have been in (some) competitive proximity
for several years.  (See supra pp. 17-18 ("Plaintiff has not offered evidence that a single
consumer, retailer, wholesaler, or distributor has been confused over the parties'
products, nor has Plaintiff offered a survey showing that confusion is likely.").)
Additionally, there is no evidence of bad faith on the part of Defendant in adopting its
marks.  (See supra pp. 19-20 ("There is no evidence of bad faith, i.e., no evidence that
Defendant sought to confuse consumers about the source of their products.").)   And,
while Plaintiff's trademarks are relatively strong and the products are in some
competitive proximity, on balance the Polaroid factors weigh in Defendant's favor.  See
Playtex, 390 F.3d at 167 ("Here, the district court did consider all of the factors, and
found that, on balance, they favored defendant.  We agree with the district court's
Polaroid balancing.  Particularly in light of the dissimilarity in the mark[s] themselves,
the differences in the way the products are presented to consumers, and Georgia-Pacific's
prominent use of its own house brand on the product's package, we agree with Judge
Baer that Playtex has failed to demonstrate a genuine issue of material fact about the
likelihood of consumer confusion.") (internal quotation marks omitted); Streetwise Maps,
159 F.3d at 746 ("Although the maps continue to compete directly with each other, the
combined weight of the Polaroid factors leads us to hold that there is not a likelihood
consumers will be confused by defendants' use of the StreetSmart mark.  Streetwise's
trademark infringement claim brought under the Lanham Act therefore fails, and the

district court's dismissal of that claim must be affirmed."); Malaco Leaf, AB v. Promotion In Motion, Inc., 287 F. Supp. 2d 355, 377 (S.D.N.Y. 2003) ("Here, the likelihood of confusion factors weigh heavily in defendants' favor. . . . Therefore, defendants are entitled to summary judgment on Malaco's trademark . . . infringement claims.").

## C. Federal Trademark Dilution

Defendant argues that courts "have rejected claims of dilution in cases involving comparative advertising." (Def. Mem. at 22.) Plaintiff argues that courts have rejected dilution claims only "for true and fair comparative advertising" and that Plaintiff's marks "are being diluted by virtue of the nature of defendant's use." (Pl. Reply at 11.)

"The [Federal Trademark Dilution Act] provides that 'the owner of a famous mark shall be entitled . . . to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark.'" Starbucks Corp. v. Wolfe's Borough Coffee, Inc., No. 01 Civ. 5981, 2005 WL 3527126, at *7 (S.D.N.Y. Dec. 23, 2005) (quoting 15 U.S.C. § 1125(c)(1)).[6] However, a specific exemption is found in the federal anti-dilution statute to allow for comparative advertising. See 15 U.S.C. §§ 1125(c)(4) ("The following shall not be actionable under this section: (A) Fair use of a famous mark by another person in comparative commercial advertising or promotion to

---

[6]     "To prove a violation of the [Federal Trademark Dilution Act], plaintiff must show that: '(1) [the senior mark] is famous; (2) the defendant is making commercial use of the [senior] mark in commerce; (3) the defendant's use began after the [senior] mark became famous; and (4) the defendant's use of the [senior] mark dilutes the quality of the [senior] mark by diminishing the capacity of the mark to identify and distinguish goods and services.'" Starbucks, 2005 WL 3527126, at *7-8 (quoting Savin, 391 F.3d at 448-49).

identify the competing goods or services of the owner of the famous mark[.]"); see also Playboy Enters., Inc. v. Welles, 279 F.3d 796, 806 (9th Cir. 2002) ("Uses that do not create an improper association between a mark and a new product but merely identify the trademark holder's products should be excepted from the reach of the anti-dilution statute.  Such uses cause no harm.  The anti-dilution statute recognizes this principle and specifically excepts users of a trademark who compare their product in 'commercial advertising or promotion to identify the competing goods or services of the owner of the famous mark.'") (quoting 15 U.S.C. §§ 1125(c)(4)).

Defendant's use of Plaintiff's mark is a comparative advertisement and "poses no risk of diluting the selling power of the competitor's mark;" rather, it allows consumers to compare the "relative merits of competing products."  See Deere, 41 F.3d at 44 ("Sellers of commercial products may wish to use a competitor's mark to identify the competitor's product in comparative advertisements.  As long as the mark is not altered, such use serves the beneficial purpose of imparting factual information about the relative merits of competing products and poses no risk of diluting the selling power of the competitor's mark.") (internal citation omitted).  And, because such (comparative) use is specifically excluded under the federal trademark dilution statute, Defendant's motion for summary judgment on Plaintiff's federal dilution claim is granted.  See Cumberland, 32 F. Supp. 2d at 581 ("'Fair use of a famous mark . . . in comparative commercial advertising' is specifically excluded from [Section 1125(c)].  This is not a case where defendant has caused dilution by altering plaintiff's logo.  Plaintiff does not claim that defendant has distorted plaintiff's mark.  It says only that the 'physical association' of the Sweet'N Low trademark with the Sweetmate trademark will cause

blurring. 'Physical association' in a comparative advertisement is hardly likely to cause dilution.").

### D. Federal False Advertising

Defendant argues that Plaintiff "has no evidence of the literal falsity of [Defendant's] labeling." (Def. Mem. at 24.) Plaintiff argues that the Court should infer the falsity of Defendant's comparative advertisement (". . . is a competing product") because Defendant argues in its briefs that the parties' products are not in direct competitive proximity (factor number 3 in the likelihood of confusion analysis, supra). (Pl. Reply at 10.)

"To establish a false advertising claim under Section 43(a) [of the Lanham Act, 15 U.S.C. 1125(a)], the plaintiff must demonstrate that the statement in the challenged advertisement is false. Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers." S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001) (internal quotation marks omitted); see also Tommy Hilfiger, 221 F. Supp. 2d at 424 ("[W]here an advertiser makes a simple claim of equivalence, as is the case here, it is not enough to show that the claim is unsubstantiated. Rather, plaintiff must show affirmatively that the statement is false.").

Defendant's statement that the products are "competing" is not literally false because the products are somewhat similar and are sometimes sold in the same stores (e.g., Walmart). (See supra pp. 15-16); see also Novo Nordisk A/S v. Becton Dickinson & Co., 997 F. Supp. 470, 474 (S.D.N.Y. 1998). Also, Plaintiff has submitted no evidence that the comparative advertisement is likely to mislead or confuse consumers. See Novo

<u>Nordisk</u>, 997 F. Supp. at 474; <u>see also</u> <u>Johnson & Johnson * Merck Consumer Pharms.</u> <u>Co. v. Smithkline Beecham Corp.</u>, 960 F.2d 294, 297-98 (2d Cir. 1992) ("Where, as here, a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse consumers. . . . Thus, the success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey.").  Plaintiff has not offered evidence that a single consumer, retailer, wholesaler, or distributor has ever been confused because of the comparative advertisement, nor has Plaintiff offered a survey showing that confusion is likely.  <u>See</u> <u>Malaco Leaf</u>, 287 F. Supp. 2d at 379 ("When an advertisement is not literally false, but rather is ambiguous or implicitly false, a plaintiff can only establish a claim of false advertising through a survey.  Malaco fails to present this Court with any survey or other evidence showing how consumers perceive the terms 'Famous' and 'New' together on defendants' Famous Sqwish Candy Fish packaging.").

Accordingly, Defendant's motion for summary judgment on Plaintiff's false advertising claim is granted.  <u>See</u> <u>Malaco Leaf</u>, 287 F. Supp. 2d at 379.

### E.  New York State Law Claims

The Court need not consider Plaintiff's state law claims.  "In dismissing the Lanham Act claims, the Court has the discretion whether to exercise jurisdiction over the remaining state law claims."  <u>See</u> <u>Prof'l Sound Servs.</u>, 349 F. Supp. 2d at 736 (citing 28 U.S.C. § 1367(c)(3); <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726 (1966); <u>Reese Publ'g Co.</u> <u>v. Hampton Int'l Commc'ns, Inc.</u>, 620 F.2d 7, 13 (2d Cir. 1980)).  The Court declines to exercise jurisdiction over such claims.  Accordingly, Plaintiff's state law claims are

hereby dismissed without prejudice to re-filing in state court.  <u>See</u> <u>Prof'l Sound Servs.</u>,

349 F. Supp. 2d at 736.

## IV.    Conclusion and Order

For the reasons set forth above, Plaintiff's motion for summary judgment [# 22] is

denied, and Defendant's cross-motion for summary judgment [# 28] is granted.  The Clerk of the

Court is respectfully requested to close this case.

Dated:  New York, New York
        May 1, 2006

RICHARD M. BERMAN, U.S.D.J.